Good morning, Your Honors. For the record, my name is Paul Huvestal. I'm an attorney from Helena, Montana. From where? From Helena, Montana. And I'm appearing on behalf of Newton Cantrell. I am going to exercise three minutes of the time that we have. And since I only have three minutes, I want to summarize my argument as follows. And I'm talking about the first issue in Mr. Cantrell's brief. And that summarization is that the district court took the wind out of my sails and the wind didn't begin to blow until it was too little and too late. Of course, what I'm talking about is a cross-examination of important terms of the plea agreement. I've submitted since the briefing to the court an important case from the Ninth Circuit called United States v. Schoenberg. And in United States v. Schoenberg, this court held that the defendant must be permitted to cross-examine the witness sufficiently to make clear to the jury what benefit or what detriment would flow and what would trigger the benefit or the detriment to show why the witness might testify falsely or to gain the benefit or to avoid the detriment. In this instance, we had a plea agreement that was written by the government that had important terms which basically affected this witness. And I'm not talking about one witness. I'm talking about a number of witnesses who testified against Mr. Cantrell and the rest of the defendants. But the terms of the plea agreement basically boil down to a Rule 35 motion for a reduction of sentence and a 5K1.1 motion for a downward departure from the guidelines. There's citations to the record, but in essence, what occurred during cross-examination of the first government witness, Mr. Bryce Granboys, was that the district court prevented me from continuing on and delving into important terms of the plea agreement. Not only that, the district court expressly instructed the jury to disregard the question and the answer that by testifying there that day, the witness could, and I suspect did, cut his sentence. Counsel, what do you respond to the argument that any error was harmless in view of the fact that there were some 30 witnesses other than the three that you are arguing about, and that just even ignoring these witnesses, the evidence was overwhelming? Well, the evidence was overwhelming as to the videos. For example, we had a witness, Carmen, who was an undercover agent with the government. And we have all this videotaped testimony. But as the Court well knows, a person cannot enter into a conspiracy with a government witness. And I think that if we take the testimony of solely that, I could have argued that there was no conspiracy because all these other witnesses had, you know, this desire to cooperate with the government. And as a consequence, there was no conspiracy. And I don't think that the error was harmless. It was a constitutional error. It began with the first witness. Well, let's get back to whether there's an error, because what I thought the judge was saying was that he was objecting to questions that said that by testifying, the witness would definitely get a lower sentence, whereas the witness's deal would permit the government to make a recommendation for a lower sentence, but the sentence would be up to the Court. And that's why I thought the judge shut you down on that line of questioning after permitting some measure of it. Your Honor, and I see my time's out already, but the question was, so if you testify here today, or so if you testify today here, you can get your time cut. And the answer was yes. I didn't say that you will get your time cut, but that you can get your time cut. And then I was going to go into the workings of Rule 35, and I was cut off. And, in fact, the district court instructed the jury that that was an inaccurate characterization, and that was expressly incorrect. And that instruction was never corrected by the district court. So the wind was taken out of my sails. What were the judge's words again? Pardon me? What were the judge's words again? And it appears at page 140 of the transcript, the judge's words were, this is an inaccurate characterization. And, again, ladies and gentlemen, I instruct you to disregard the question in response. And as I said earlier, the determination of sentence of any matter in this Court is for the Court to decide, not for Mr. Granboy or for counsel or the United States to decide. Well, that's not a true statement, is it? Well, sentencing is for the Court to decide, but whether the Court even gets to decide Sentencing used to be for the Court to decide 30 years ago. Maybe it's going to be the case. That's correct. It was for the Sentencing Commission to decide. But sentencing isn't for the Court to decide. The Court decides within very narrow limits. Well, for purposes of Rule 35 motion, it's my position that in order to even come within discretionary sentencing, the government had to file a motion for reduction. And the only way that they could file a motion for reduction is if Mr. Granboy and the remaining witnesses testified in court against the defendants. That's the only way discretionary sentencing could not have occurred if the government did not believe that they were providing substantial assistance. And I would relinquish the remaining time to the Court of Counsel. How do these recent cases that you've had, Ameline and the others, affect your client? Your Honor, I haven't made an in-depth analysis of that. Mr. Cantrell received a sentence of 390 months, which is a substantial sentence, as the Court well knows. I can't imagine that it would hurt if we brought this matter up before the district judge again to resentencing. As I understand it, you requested relief under Booker. Is that right? I believe we did, Your Honor. Okay. So I think your client's entitled to that. All right. If it may please the Court, my name is Ed Sheehy, Jr. I'm representing Donna Cantrell. And with my time here today, I'd like to simply address the last issue we raised in our briefs on appeal dealing with the district courts submitting a special interrogatory to the jury on count 28 on the guns, where the jury, over our objection, was being allowed to pick which gun, if any, my client possessed, allegedly during these drug conspiracies. And it is our position that this took us by surprise. It was a variance from the indictment in that the indictment charged her with all three guns. And, therefore, we should have been entitled to argue to the jury that if they found she didn't possess any one of those guns, she then should be acquitted of that gun count. The government has argued that, well, this was proper because you have different penalties for different types of guns. But this wasn't the issue here. It was going to be the same penalty whether they found one gun or three, because we weren't talking about machine guns or anything like that. And so we would ask the court to reverse her conviction. What did the jury find? The jury found one gun, which was the pistol, not the two rifles that she was charged with. And it was our position that we should have been. So it's your position that had the jury simply rendered a verdict of guilt without mentioning the guns, that somehow you could have overturned that? No. I understand your position. Our position was that it should have been, did she possess all three of these guns just in a general verdict form, but not a special interrogatory asking them about each separate gun? And what precedent says that if an indictment charges possession of three guns, that it's an improper variance if there's just proof of possession of one? I have not found a case that deals with that issue, Your Honor. Let me ask another question that was of concern to me. The handgun is found, again, her bedroom. What's the evidence that shows a nexus between the gun and the drug conspiracy, that is, the use of the gun in furtherance of a conspiracy? Excuse me, Your Honor. The gun was actually found in the living room on an entertainment center. Living room on an entertainment center. Okay. I agree that there isn't any nexus. That was all. I wasn't saying there wasn't. I'm asking what the quality of the evidence is on it. The only evidence the government had about that particular gun was some testimony from a Bernadine Bear, but she was never shown that gun and asked if a .22 that she said that my client had at some time possessed, she was never shown a photograph of that gun, she was never shown that gun. She did not particularly identify even a handgun other than, she said, a .22. So I don't believe there was any evidence to establish a nexus between any of the firearms and the drugs. Bernadine Bear says she uses a handgun when she's doing her drug deals, or she uses a .22 when she's doing drug transactions, but Bernadine Bear doesn't identify the particular gun that was found in the entertainment center. Well, and she didn't even say that she used a gun during drug transactions. She said she had it for protection. Okay. It's your client's position that there's no substantial evidence was submitted that the gun was used in furtherance of a conspiracy.  Thank you. Thank you. Your Honor, I'm Mayo Ashley. I'm from Helmand, Montana. I represent Jack Covers Up. Is the courthouse still on Last Chance Gulch? No, it's not, Your Honor. They built a new courthouse up north, right next to, almost across the street from Carroll College, Your Honor. They moved. Because that one was a little cockeyed, I think, wasn't it? Right. I basically have three issues in my brief, but I will cover two of them. One of them is similar to the issue of Teresa Walker. That's a motion to suppress, Your Honor. I have argued. I'm only going to take about two minutes, Your Honor. One of the things that I'm arguing is the court should have granted my client either minimal or minor participation in this overall conspiracy. There were nine or ten defendants charged here. My client was charged with conspiracy in count one, as were all of the other defendants. He was also charged with possession for intent to distribute marijuana and possession with intent to distribute methamphetamine. The government in the indictment alleged that he intended to distribute more than 50 grams. Mr. Covers Up was found by the jury not guilty of the overall conspiracy charge and not guilty of the possession of the marijuana. He was found guilty of the possession of methamphetamine with intent to distribute but less than 50 grams. Several of the co-defendants asked for downward departures, despite the fact that they were found guilty of the overall conspiracy. And were found guilty by the jury of possession of more than 500 grams. The government, I'm sorry, the sentencing court found that my client was involved in the overall activity, notwithstanding his acquittal of the conspiracy charge. I think that an adjustment was required in this particular case. And then my second argument is the acceptance responsibility that the district court refused to give my client credit for acceptance, despite the fact that he went to trial and had to preserve, in my opinion in any event, had to preserve the suppression motion that had been denied pretrial by the district court for both my client and Teresa Walker. And Mr. Meyer will speak to the motion to suppress your evidence. Thank you. May it please the court, my name is Mark Meyer. I'm an attorney from Great Falls, Montana, and I represent Teresa Walker. The focus of my appeal is on the district court's denial of a motion to suppress regarding an investigative traffic stop that occurred on March 13, 2002. The focus of my argument today is the district court's reliance on the collective knowledge rule and its citation to the Sutton decision to support the denial of the motion to suppress. Specifically, there's no evidence in the record herein to support the district court's, the fifth factor cited in the district court's opinion, that knowledge that Newton Cantrell came to Glasgow to meet with Jack Covers Up for the specific purpose of meeting Jack Covers Up in Glasgow. A review of Officer Kemp's testimony at the suppression hearing, particularly at pages 41 and 42, reflect the fact that it was after the vehicle, the decision, one, the decision to stop the vehicle had been made and the vehicle had actually been stopped, that Officer Kemp, one, learned the identity of the driver of the Bronco, Jack Covers Up, and was relayed the information that the Cantrells had met Mr. Covers Up at Johnny's Cafe earlier that day. That information was not available to them, known to the officers who made the decision to stop the vehicle. And the fact that the information was subsequently determined after the stop had been made distinguishes this case from the Sutton decision and doesn't permit the use of after-acquired information to support the decision to stop the vehicle. In that regard, I'll point the court to the United States v. Mayo at 394 F. 3rd, 1271, a 2005 decision where an officer was dispatched to check on suspected narcotics activity and was given the description of four vehicles. He appeared on the scene, noticed one of the vehicles that had been described to him was there, approached the driver, and ultimately led to an arrest. And focusing at footnote 7 in the Mayo decision, the court stated Officer Golden, who arrived on the scene first, did not know all the facts. Collectively, however, officers knew all of these facts before Officer Golden detained Mayo and asked for his identification. The same holds true here. The only information that justified the investigative stop was what Officer Kemp observed at the convenience store in Glasgow, which he testified was a brief hello, a hand gesture between Newton Cantrell and an individual later determined to be Mr. Coversup. And he testified he did not observe any money exchanged hands and did not observe, in fact, anything exchanged hands between the two other than this greeting in the parking lot of the convenience store. And based upon that, made his determination that he had observed a drug transaction, and that was his reasonable basis for stopping the vehicles. And it's our position, Your Honors, that there was no objective, reasonable basis to support the stop of the Ford Bronco and that all evidence seized as a result of the stop should have been suppressed by the district court. Thank you. I have one question for you. How's the 10th Street Bridge doing? The 9th Street Bridge, Your Honor. The 10th Street Bridge. Oh, okay. The 9th Street Bridge. They're still in the process of trying to restore it.  Good morning, Your Honors. My name is Dan Buckley from Bozeman, Montana. I first appreciate the court willingness to allow me to appear by video. Can the court hear me okay? Great. Sure can. Thank you. Again, I represent Angela Walker. We raised four issues on appeal. The first issue I'd like to focus in on is the insufficiency of the evidence against my client at trial, and that was on count one. For which the jury found her guilty and for which she was sentenced to over 14 years in prison. We start with the first principle that if you have equally plausible scenarios presented by the evidence that is both innocence and potential guilt of the offense, the government has the burden of proving that it's not innocence and that it is guilt. And if that proof is not sustained, then the jury should return a verdict of not guilty, coupled with that basic principle. Excuse me, counsel, but the jury can choose to believe if two people testify and one could say ostensibly that there's equal evidence, the jury can choose to believe one witness and not the other, correct? The jury can decide to believe one over the other, yes. My point, Your Honor, is when you couple that basic premise of law with the other principles of law under conspiracy, the evidence in this case was not sufficient to convict. And the other principles, of course, that I'm talking about is mere presence, mere association, and the court has also discussed youthful inexperience, lack of common sense, personal relationships that put that person in proximity to the other co-defendants. And the court has even said that imprudence is not a crime. The evidence in this case established that she was tied by personal relationship and by community to the other defendants in this case. Most of the trial was spent focusing in on some of the other main defendants in this case, and it happens to be that my client resided in a trailer next to Donna Cantrell for part of the time, and there was evidence that she was there. Now, the government of the 35-plus witnesses or so, there were, I believe, five witnesses that directly mentioned my client, and I've covered that in my brief. Carmen Cantrell began looking at these principles of law. Carmen Cantrell testified in regard to a trip to Washington, but she also testified on cross-examination that she didn't know that the trip was for Donna Cantrell's pickup of drugs from Morales, that it didn't appear that Angie, my client, had ever met Morales. Angie wasn't involved in the transaction. Angie didn't help put drugs into the car. She essentially was present. But, counsel, if you take these circumstantial things and the testimony of Bernadine Baird, if the jury believes all of that, isn't that sufficient? The court is in a position to look at the testimony of Bernadine Baird, and I've outlined the instructions. If the jury believed it, was it sufficient to support the conviction along with the other circumstantial evidence? If the testimony of Bernadine Baird is believable, yes. I have to acknowledge that. So basically you're asking us to make a determination about credibility that the jury was unwilling to make. I've pointed the court to case law that would allow the court to do that. If it is inherently improbable testimony, then the court can provide relief to the defendant that was convicted on insufficiency of evidence. If it was substantially weakened on cross-examination, the court can intervene in a situation like this and provide relief to an aggrieved defendant who has been convicted. In this case, Bernadine Baird was involved in this investigation for two years. She never once mentioned Angie Walker. She was prepped for trial testimony the night before. The lead investigator testified that he, after Bernadine Baird had testified, he then testified on cross that he had never heard my client's name in two years, never heard my client's name mentioned the night before she testified. And yet she comes into that jury trial and says to this jury that my client on an everyday basis was cutting up and packaging not only methamphetamine but marijuana. The government had never heard that before. And so I think it's just inherently improbable testimony. It's at complete odds with the government's case. I see my time has run quickly. I've raised the other issues with regard to the other witnesses. For example, Mr. Walsh admitted on cross-examination that he denied receiving drugs from Angie Walker prior to trial but yet takes the stand and tells the jury that he had received drugs from my client, Angie Walker, and then denies it on cross-examination. The other two witnesses were fairly minimal testimony, and I've raised that in my brief as well. The final argument I would like to make, and I'll make this very brief, is the sentencing issues. I have not had a chance to fully discuss the impact of Ameline and the Booker decisions. I would just urge the court to allow counsel, if the court would permit, to supplement with any briefing or at least advise the court on the sentencing issues. Thank you. You may be curious, the reason I mentioned the 10th Street Bridge, I spent a couple of years mediating that dispute, and so I know all the people involved. You may not know this, but there's a book called America's 100 Treasures, and the 10th Street Bridge is about two pages away from Edison's laboratory. Did you know that? Come here, I'll teach you a little bit about Montana. Go ahead. May it please the Court. My name is Deirdre Coughlin. I represent James Daniel Murphy. I'm an attorney from Butte, Montana. Briefly, Your Honors, with regard to our argument, it is primarily a sufficiency of the evidence argument. I understand the standard of proof is very high in this that any rational trier of fact must have been able to find Mr. Murphy involved in the conspiracy beyond a reasonable doubt. However, respectfully submitted, Your Honors, that any rational trier of fact with these particular witnesses could not have legitimately found Mr. Murphy guilty of anything more than being a mere user of methamphetamines, being on one occasion a trader of methamphetamines. And that would be the reference to Evander Redboy indicating that her boyfriend had traded methamphetamines with Mr. Murphy for a weapon or vice versa, or the testimony of James Welch. However, even with the number of witnesses that came in and testified in this particular trial, there were relatively few references to Mr. Murphy other than the fact that he had allegedly stolen a safe belonging to and drugs in those. It is respectfully submitted, however, that assuming that this incident had occurred, that that could hardly be considered part of an agreement between Mr. Cantrell and Mr. Murphy to sell, to distribute methamphetamines. The other witness that was particularly, that mentioned Mr. Murphy with any specificity was Bernadine Baer. And that is, and I would submit to the Court that her testimony was certainly insufficient to any rational trier of fact to establish Mr. Murphy as part of this conspiracy. That is, Ms. Baer testified that Mr. Murphy was not trusted, that Donna Cantrell believed that he had stolen her purse and therefore he was not to be trusted with anything, that he was always basically around there, was Ms. Cantrell's testimony. So, and the final element of Mr. Murphy's alleged involvement in this conspiracy was that of H.G. Hamilton, who allegedly received Mr. Murphy's confession that he was the, quote, money man. However, essentially this is the only testimony that Mr. Murphy was involved in any kind of trading of capital for drugs or anything else, and that was from a government agent. But no factual witness came before the Court and advised them that Mr. Murphy was involved in any element of this conspiracy other than being a mere user or merely present in this conspiracy. And with that, I see that the government agent testified before the jury. He testified before the jury, and with respect to Mr. Murphy, he said what, in response to the government's question, what was Mr. Murphy's involvement, and he basically said he said he was the money man. And that was the extent of the factual information that was given to the jury about how the money was used. There was nothing in addition to that. I recognize it's thin. There's not very much there, but could the jury just believe it just like that? Well, without any additional factual witnesses talking about how the cash was, would have been transferred from one party to the other for these, I would assert that that is incredible. He said he was the money man. How do we define that? And he defined it no further. And I see that my time is up, so I would ask that the Court consider my other arguments in addition on the conspiracy instruction. Thank you. Thank you. Good morning, Your Honors. My name is Jim Obey. I am also from Helena, Montana, and I represent Janine Lucille Renz. I have made two arguments in my brief. The first argument is that there was insufficient evidence to convict my client. The witnesses were not reliable. They were contradictory. And I've spelled out in my brief the different allegations as of each of those witnesses. My second argument I've made before the Court is that there was a very large discrepancy between the jury finding of over 500 grams of methamphetamine and the PSR finding of between 50 and 250 grams. Based on that, I presented an argument in my brief as to why the Court should set aside the conviction in this case based upon the sufficiency of the evidence. And I'm available for any questions the panel may have. Thank you. Thank you. Good morning, Your Honors. My name is Marcia Hurd, and I'm an assistant U.S. attorney for the District of Montana, and I'm stationed in the Billings office. In looking at the issues that have been presented here today, the first issue that's been discussed at some length is the pretrial motion to suppress issue. The suppression issue was properly decided by the District Court. There were facts that were basically submitted to the State District Court in a suppression hearing that was held, and all parties interested in that suppression hearing and the suppression issue then agreed that the federal court could rule based on the record that had been submitted to the state court. In this case, the United States submits that there is evidence from which this court can uphold that finding, that there was reasonable suspicion because that finding is reviewed for clear error. And in this case, we have basically what appeared to the experienced drug investigating officer investigating the Cantrell drug situation, a drug deal that had gone down basically right in front of him. He was actually off duty at the time and radioed for assistance because he was not in a position, being in his own personal car with his wife, to go make those stops. What did he see? He saw Newton Cantrell, whom he knew from his extensive investigation, to be an alleged drug trafficker. He even had a warrant for Newton Cantrell's vehicle based on most recent information that Cantrell was going to be bringing drugs to the Glasgow area. This stop was made actually in Glasgow, and what he saw at the gas station was in Glasgow, Montana. And he observed, as he was standing there watching Newton Cantrell, what he believed to be a hand-to-hand drug deal that went down basically right in front of him as he was watching. He radioed for assistance. What did he see? What did he see at that time? He saw a hand gesture that in his experience between these two men was not a handshake, was not a greeting, but what he believed was a drug deal, an exchange of some sort. What was that gesture? I'm just curious. Well, we don't have a specific record to be able to present to you of exactly what that gesture was because that hearing took place in front of the state district court, and there is no specific description by the court of saying, okay, you're making a gesture that looks like this and describing it. Officer Camp described it as what he believed to be a drug transaction that had just occurred in an exchange between these two men in the parking lot, one from whom he knew to be a drug trafficker and the other one to whom something appeared to be given. He couldn't say that he actually saw drugs move hand-to-hand, but he believed that something had occurred between those two men that looked to him to be a drug exchange. Counsel, could we rule on an alternative basis that the search was by consent? Is that available to us? Absolutely, because the case law is clear that the subjective motives of an officer involved in the traffic stop do not invalidate an otherwise proper stop. And in this case, the testimony is also clear that there was what's called a 20-day sticker in the back window of this vehicle that was being stopped that was impeded from being seen, and there was a violation there, which the officer stopped him for. There was some conversation, some inconsistent statements that were made based on everything else that the other officers knew, and then a consent that was given. And there just isn't an argument that this wasn't a valid consent. The evidence in this case is clear that the officer told Jack Coversup that he did not have to consent. There were no weapons drawn. He was not in custody and free to leave. And there was no discussion about, well, if you don't consent, then I'm going to go get a search warrant. And I think under the Ninth Circuit case law, it's very clear that all of those things play into whether a consent is valid in this case, and there was nothing that would invalidate the consent that was given. Well, if the initial stop was constitutional error, wouldn't that taint the later consent? It could be if there was constitutional error, but in this case, there is not. I understand that, but my question was, if there was an error in the stop, then the consent wouldn't carry the day. I'm not saying there was error in the stop. I'm saying I don't think the consent is, in that sense, an alternative to assessing if there's reasonable suspicion. Well, I think you're correct, Your Honor, that there needs to be a reasonable suspicion, but there doesn't have to be any discussion about was there a subjective motive for that stop. I understand that. Now, my understanding, but tell me if I'm wrong in this, is that the officer who made the stop had been advised, in addition to the request from Kemp, that he had been advised that when Mr. Cantrell was stopped, he said he went to the town to meet with Mr. Coverzone? That's correct, Your Honor. It was actually Mrs. Cantrell, I believe, who related that when she was in the car with Newton Cantrell. And Officer Berkeley did have that information in his possession before he made that stop. And so, again, the argument that there is no evidence to support the fifth finding that the court made is incorrect. There is evidence in the record, specific evidence, that that information was given to Officer Berkeley before he made the stop. Does the law let us look at what each of the police officers involved knew, whether or not they had communicated it to Mr. Berkeley, to Officer Berkeley? I believe it does, Your Honor, in addition to the fact that there's a 20-day sticker violation that he's pulling him over for and indicates to him that that's one of the reasons he's pulling him over for. But the collective knowledge that was given to Officer Berkeley heightened his suspicions then as he makes the traffic stop, and there's all these inconsistent statements about, I didn't meet with him, well, but other people said that you did, and that you went to Johnny's Cafe for supper, and completely different stories about where these people have been and the contact they've had with each other. Could I direct your attention to two issues that were of concern to me? Certainly. Maybe you can answer them in the course. One was what is the evidence that the handgun that's found, or the gun that's found in the entertainment center in Mrs. Cantrell's trailer was used in furtherance of the drug conspiracy? Your Honor, I believe that in this case, the jury found that she possessed the gun with the intent to further the drug conspiracy. The evidence with regard to the pistol was that Bernadine Baer had observed a pistol in Donna Cantrell's bedroom in her residence where large amounts of drugs and large amounts of money were found when the search warrants were executed, and that she had indicated that she kept that gun for protection. At the point that discussion had been had with Bernadine Baer, Newton-Cantrell's safe full of a large amount of methamphetamine and approximately $25,000 in cash had already been stolen from his residence by James Murphy and taken from him, and Ms. Cantrell had knowledge of that, had a safe in her bedroom that also had large amounts of items in there. So I believe that there was evidence from which a jury could find, and they looked carefully, I believe, from their own verdict as to which guns were specifically possessed for what reason, because interestingly, the two rifles that were the other subject of the indictment were actually found in the closet where the safe had been hidden, and the jury found her not guilty of possessing those two with the intent to further the drug trafficking conspiracy, but did find her to possess the handgun. So I think they looked at all of the evidence that was submitted to them carefully about where those guns were found, the fact that she'd used the one for protection she indicated to Bernadine and made their decision based on that. The other issue that nobody's talked about, I don't think, explicitly, but that was of some concern to me from the briefing, though it was just raised in one sentence in the briefing, was as to Teresa Walker, what evidence tied her to the conspiracy? I don't think the government addressed that in its brief, because there was just a reply. She didn't argue sufficiency of the evidence in her opening brief, as I understand it, but put it into a reply brief sentence, and so the government couldn't respond to it, and it may be waived or it may not be waived depending on the circumstances. But just tell me what the evidence is on that. Well, Your Honor, you're certainly right with regard to the facts. She did not raise it in her opening, and it was only in the reply brief. The facts with regard to Teresa are that she was the daughter of Donna Cantrell. We have the traffic stop that leads to her actually being in possession of the drugs that were exchanged between Newton Cantrell and James Coversup in that exchange that was seen by Officer Camp. She had those tucked within part of her undergarments when she was searched at the jail. She also had within her person a tire repair kit that was in, I believe, one of her coat sleeves that fell out during this search that took place after the consent. There was also testimony in this case from Bernadine Baer, who indicated when she was kind of the housekeeper or gopher person for Donna Cantrell, that Teresa did come down on several different occasions and got methamphetamine and marijuana from Donna Cantrell for redistribution back where she lived, which was on another reservation. My memory is that Bernadine indicated that that occurred on two different occasions and that then there was a fight between the girls in this family, that they were angry over the fact that Teresa had gotten the last of the narcotics and that there wouldn't be any more until there was another run to Washington to pick them up. Okay, thank you. Are there any other issues? There's another issue that was argued that was of concern to me, and that's regarding Mr. Murphy. So what is the quality and the scope of the evidence that ties him to the conspiracy? Is it just a government agent statement that he said he was a money man? And if so, is that tied to this conspiracy? Your Honor, I believe that it is tied to this conspiracy, and certainly the defendant's confession to a government agent does not need to be corroborated in any fashion by lay witnesses as suggested in oral argument here today. This defendant freely admitted when he was questioned that he was the money man for this conspiracy. There was also testimony from several of the other witnesses that testified in this case, most specifically James Welch, about Mr. Murphy's role with the conspiracy and about the fact that he ended up being kind of outed from this group at one point, at least from Newton's perspective, because he stole a bunch of money and methamphetamine from a safe in his residence and then later was somewhat shunned by Donna Cantrell because he had stolen her purse and because nobody trusted him at that point. So I think, again, there was sufficient evidence within the record from other cooperating co-defendants and other witnesses to tie Murphy to both the methamphetamine and the marijuana conspiracy and that his role was not a person who was a mule or who went out to get the drugs, but he was more the person who was the enforcer and in charge of the money within this conspiracy. What was the evidence regarding the amount? There was an argument made that because the PSR had a smaller amount, that there wasn't sufficient evidence for the 500 grams or more. And I believe that was raised by Jeanine Renz, that there was a dispute between what the jury found, which was more than 500 grams for her role within the conspiracy, and the pre-sentence report author who said, I basically can't determine specific amounts but somewhere between 500 and 250. Your Honors, when the jury makes a finding beyond a reasonable doubt of an amount that is attributable to the defendant. That's my question, though. What was the evidence supporting the jury's finding of more than 500? I'm not quarreling with your proposition that the jury's finding beyond a reasonable doubt is what it is if there's evidence to support it, and it's that piece that I'm asking about. Certainly. There was testimony from several different people in this case. Once again, Bernadine Baer, who was the person within the residence who saw her assist in various forms of helping to cut up drugs, helping to repackage drugs, and things of that nature that was submitted to the jury. There was also testimony from another witness about going to the residence with an amount of money that needed to be paid to Donna Cantrell, and that Jeanine Renz was the person who took that money. It was a significantly large amount of money that was actually for a drug debt. Ms. Renz, I believe, was tied within the conspiracy, not as a person who made trips again, but as a person who assisted in repackaging, in cutting items up, and in taking money when she was at the residence and in further assisting in the redistribution part. How did that get to 500 grams? That's my question. Where does the 500 come from? Well, I think what the jury decided is that there was a very large amount of methamphetamine in this case, and they were told that people within the conspiracy could be held responsible for the amounts within the conspiracy if it was reasonably foreseeable to them. And the jury made a finding that it was reasonably foreseeable, because of Jeanine Renz's close association with all these people and her relationship, I believe that she was Donna Cantrell's niece and stayed in the residence. How did it get to 500? I'm asking about a number. Did anybody say there was $100,000, which translates to 1,000 grams, to purchase it? Did somebody talk about the amount? Yes. Okay, what's the evidence about the amount? Carmen Cantrell talks a number of times about bringing back certain amounts of pound to two-pound quantities of methamphetamine. There was discussion from Ron Camp about the amounts that were sold, some discussion of the videotapes and how much a gram would be and how much an ounce would be and some of those kinds of things. Taffy Hamilton, who was one of the cooperating co-defendants, also talked about purchasing various amounts and how much money would buy certain amounts of drugs. And so I think the jury looked at more than 500 grams responsible to Jeanine being reasonably foreseeable because of the number of trips that were being made and the pound quantities that were being brought back, one pound being about 434 grams, I believe, in and of itself in one trip and the number of trips that were being made. Excuse me. I'm sorry? What did you argue as far as the weight is concerned? Did you argue 500 grams? What did you argue? I believe that I argued in closing, if that's what you're referring to, to more than 500 grams because the indictment charged more than 500 grams. And, of course, we tried this case two years ago in August where there was not as much emphasis on specific amounts. And the jury then heard testimony from so many people, and we argued about more than 500 grams, the number of trips that were made, at least one to two pounds of methamphetamine that came back during each trip, and that we also added up amounts that were made in the traffic stop. If it goes back for resentencing, how are you going to prove 500 grams? If it goes back for resentencing, Your Honor, we've already proved 500 grams. And it has to be proved by a jury, doesn't it? Your Honor, the jury already found more than 500 grams, but if you're talking about an amyline remand, the district court would then need to look at, if the defendants choose to have an amyline remand with regard to amount, the district court would have to look at whether the sentence that was given was reasonable and whether the sentence would have been the same had they known the guidelines were advisory rather than mandatory. In this case, the district court was very careful at sentencing to hear amounts of testimony on the disputed drug quantity, including at that time from Mario Morales, who was the middleman. Mr. Morales had pled guilty and agreed to cooperate, and there was testimony that was presented. With regard to Jeanine Rands, on literally the eve before she was sentenced, she finally agreed to debrief to be able to get a safety valve reduction, and she admitted and talked about her role within the conspiracy and the amounts that she thought she was responsible for. And the district court got that information prior to sentencing as well. She was under oath when she presented that information? Jeanine Rands was not under oath. She agreed to, right before sentencing, agree to give information about her role within the conspiracy to gain the safety valve. She did not specifically testify at her own sentencing, but what she had told the agents was related to the court. Are there any other issues or questions that any of the panel members have? I don't think so. Okay. Hearing none, I will go ahead and leave this to your deliberation then. Thank you. Thank you. All right. Any rebuttal will give you a chance to come back. You know, there's a book out that tells you how to make your point in 15 seconds or less. I would very briefly, on behalf of Donna Cantrell, like to respond to the question about the nexus of this handgun. In answer to Ms. Hurd's argument, she talked about the safe being stolen. The safe that Donna Cantrell had was in that bedroom in that closet where those two rifles were. The jury obviously found there was no nexus between those rifles and that safe. There clearly could have been no nexus between that safe and the handgun, which is out in the living room on the entertainment center and not anywhere near that bedroom. Thank you. The court was asking, regarding the motion to suppress, what kind of a contact there was. Officer Kemp testified that he actually didn't see the hands meet. He said it was sort of like this, almost like passing off a football. In cross-examination, both by myself and Mr. Meyer, he admitted that he saw nothing exchanged between the two people, saw no money exchanged. He saw no package, but didn't he say that, in his experience, he thought the hand gestures were indicating that there was a drug transaction? That's what he said, Your Honor. I suspect it was a – they had Newton Cantrell. They knew that they had him involved in this conspiracy. I think they were looking for an excuse to stop. But could a jury believe that testimony? I don't believe they did, Your Honor, because they found my client not guilty of the conspiracy. I think had they believed it, they would have said, well, okay, there was an exchange here, and therefore he's involved in a conspiracy. They found him guilty, though, of possessing the drugs, right? Yes. Conspiracy, but a possession with intent to distribute. So I don't see why that would rule out that they could think he gave some sort of – Well, what I'm saying, I guess, Your Honor, is the testimony was sort of incredible. Also, as far as the weight was concerned, I think Judge Graber asked about this. The original jury sent back the various plea or the various verdicts, and they had – because I think the jury foreman was a nurse or something, she had put sort of a V-shaped, inverted V things for more than and less than 50 grams, and the district court sent it back to – told the jury to be very specific. Do you mean more than or do you mean less than? And that's when the verdict form was changed, Your Honor. With respect to the evidence linking Theresa Walker to the conspiracy, the sole direct evidence linking her to the conspiracy was the drugs that were seized as a result of the investigatory stop. The only other testimony throughout the week-long trial was statements by Bernadine Barrett, she indicated that on two occasions it was her testimony that Donna Cantrell had given Theresa Walker drugs. There was no testimony regarding any amounts that were given, and she admitted she didn't know whether Theresa Walker gave Donna Cantrell any money for those drugs. That was the sole extent of any other evidence linking Theresa Walker to the conspiracy. Okay. All right, that's it then, and the matter will stand submitted, and the court's going to take a 10-minute recess. All rise. This court stands in recess for 10 minutes. Oh, no. You're still alive. All right. Thank you.
judges: Pregerson, Graber, Gould